IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
2010 MAR 17 PM 3:07
CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
        DEPUTY

MICHAEL CARR and ERNEST HOLLY,
                    Plaintiffs,

-vs-                                        Case No. A-09-CA-212-SS

FARMERS SERVICES, LLC,
                    Defendant.

# ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant Farmers Services, LLC ("Farmers")'s Motion for Summary Judgment [#21], and Plaintiffs Michael Carr and Ernest Holly (collectively, "Plaintiffs")'s response thereto [#25]. Having considered the motion and response, the relevant law, and the case file as a whole, the Court enters the following opinion and order.

## Background

Plaintiffs bring this action under the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621 *et seq.*, alleging Farmers willfully discriminated against them on the basis of age. Compl. at ¶ 31. Plaintiff Carr is 56 years old and has been an employee of Farmers since 1988. Pl.'s Resp. at 1. Plaintiff Holly is 55 years old and has been an employee of Framers since 1979. *Id.*; Defs.' Mot. Summ. J. at ¶ 1.

In 2007, Carr held a position called "Senior Marketing Specialist," and Holly held a position called "Agency Information Management Specialist." *Id.* But in May of 2007, Plaintiffs allege they were informed a reorganization of the company was taking place, and a new position—entitled

"Personal Lines Grown Consultant" ("PLGC")—was being created, which would eliminate the positions then held by Carr and Holly.[1] Both Plaintiffs applied for the new PLGC position and were interviewed, but neither of them was selected. Compl. at ¶¶ 16-18. Instead, Farmers hired five other applicants (all younger than Carr and Holly) for the position.[2] *Id.* at ¶¶ 19-20. Plaintiffs claim they were fully qualified for the PLGC position, but at least some of the successful applicants did not meet the posted job requirements for the PLGC position. *Id.* at ¶¶ 21-24.

Carr also applied for the position of "Marketing Specialist," but was not hired for the position. Pl.'s Resp. at 2. He claims Farmers hired instead "a much younger employee who did not meet the minimum requirements of the job." *Id.*

Both Plaintiffs were ultimately offered the position of Senior Relationship Specialist, which each accepted and started on October 1, 2007. Def.'s Mot. Summ. J. at ¶ 2. Plaintiffs still work in this position to date. *Id.* However, Plaintiffs claim the position represents a pay cut and job grade demotion for both of them, and will affect their ability to earn future pay raises and their pension benefits. Compl. at ¶¶ 25-27.

---

[1]The Court notes that Plaintiffs appear to believe their positions were eliminated *because of* the creation of the PLGC position, which they claim incorporates many of the duties of Plaintiffs' former positions. Pl.'s Resp. at 1. In other words, they believe the PLGC position effectively replaced their old positions. *Id.* They cite as evidence the memorandum Carr received in July 2007 from Farmers executive Larry Pratt, which stated "As a result of the creation of the...PLGC position, certain positions within the department are being eliminated. Your position of Senior Marketing Specialist...has been identified as one of those being eliminated." Carr Decl. at Ex. D. But Farmers now casts the situation in a somewhat different light, claiming Plaintiffs' former positions were simply eliminated due to a reorganization of the Marketing Operation, and the PLGC position was created in May 2007, but was not a direct replacement for Plaintiffs' positions. *See, e.g.* Def.'s Mot. Summ. J. at 2.

[2]Plaintiffs claim the five successful candidates for the PLGC position were the following ages in 2007, on the day they applied for the position: 30, 37, 40, 38, 25, 35.

Plaintiffs exhausted their administrative remedies by filing administrative charges of discrimination with the Equal Employment Opportunity Commission (the "EEOC"). *Id.* at ¶ 34. Plaintiffs received right to sue letters from the EEOC. *Id.* They filed the present lawsuit on March 25, 2009.

## Analysis

### I. Relevant Law

#### A. Summary Judgment Standard

Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding summary judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party. *Richter v. Merchs. Fast Motor Lines, Inc.*, 83 F.3d 96, 98 (5th Cir. 1996). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990).

Both parties bear burdens of production in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The moving party has the initial burden of showing there is no genuine issue of any material fact and judgment should be entered as a matter of law. FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322–23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The nonmoving party must then come forward with competent evidentiary materials establishing a genuine fact issue for trial, and may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256–57; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

475 U.S. 574, 586–87 (1986). Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the non-movant's burden. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

### B. Discrimination Under the ADEA

Both parties agree t the burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1978)—often called the *McDonnell Douglas* framework—applies to the present case, as Plaintiffs rely upon indirect evidence of discrimination.[3] Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Shackelford v. Deloitte & Touche*, 190 F.3d 398, 404 (5th Cir. 1999). To establish a prima facie case of age discrimination based on circumstantial evidence, a plaintiff must show "(1) he was over the age of 40 at the time he was not selected for the position; (2) he applied and was qualified for a position for which the employer was seeking applicants; (3) despite his qualifications, he was not selected; and (4) either (a) a candidate outside his protected class was hired, (b) someone younger was hired, or (c) he was otherwise not selected because of his age. *McClaren v. Morrison Manage. Specs., Inc.*, 420 F.3d 457, 462 (5th Cir. 2005).

The prima facie case, once established, raises an inference of intentional discrimination, and the burden of production shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its actions. *Id.* This burden "is one of production, not persuasion; it can involve no credibility assessment." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). Once the employer meets its burden of producing a legitimate, non-discriminatory reason for its employment decision,

---

[3]Although *McDonnell Douglas* was a race discrimination case, the same three-step burden-shifting analysis applies to ADEA cases. *See Evans v. City of Houston*, 246 F.3d 344, 349 (5th Cir. 2001).

the presumption of discrimination created by the plaintiff's prima facie case disappears and the plaintiff must meet his ultimate burden of persuasion on the issue of intentional discrimination. *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005). Thus, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* A plaintiff may avoid summary judgment by presenting evidence giving rise to a genuine issue of material fact regarding either (1) whether the defendant's reason is untrue, and is merely a "pretext" for discrimination or (2) whether the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" was plaintiff's protected characteristic. *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 356 (5th Cir. 2007).

## II. Discussion

### A. Prima Facie Case

Again, to establish a prima facie case of age discrimination based on circumstantial evidence, a plaintiff must show "(1) he was over the age of 40 at the time he was not selected for the position; (2) he applied and was qualified for a position for which the employer was seeking applicants; (3) despite his qualifications, he was not selected; and (4) either (a) a candidate outside his protected class was hired, (b) someone younger was hired, or (c) he was otherwise not selected because of his age. *McClaren*, 420 F.3d at 462. Farmers does not dispute Plaintiffs have both stated a prima facie case of discrimination, as it is undisputed both men were over 40 at the time they were not selected for the positions in question, both applied for and were qualified for the positions in question, and the candidates who were ultimately hired for the positions were younger and/or outside the protected class (i.e., below the age of 40). Because Farmers does not dispute any of the foregoing in its motion

for summary judgment, the Court finds Plaintiffs have stated a prima facie case of discrimination and moves to the next step of the analysis.

### B.     Legitimate, Non-discriminatory Reason

Once the prima facie case is established, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Id.* Again, this burden "is one of production, not persuasion; it can involve no credibility assessment." *Hicks*, 509 U.S. at 509. In the present case, Farmers claims it has articulated legitimate, non-discriminatory reasons for not hiring either Plaintiff for the PLGC position and for not hiring Carr for the Marketing Specialist Position: Farmers claims the interviewers felt Plaintiffs did not interview as well as the chosen applicants (as evidenced by their interview scores), and Plaintiffs were not as well-suited for the positions as the chosen applicants. Def.'s Mot. Summ. J. at 14. Specifically, Farmers submits the following evidence.

#### *(1) The PLGC Position*

The PLGC position was created in May 2007 with five available openings. *Id.* at ¶ 3. The job posting for the PLGC position states under "Experience Requirements" the following: "Five years with [Farmers] in Marketing, state office, or Underwriting in a salary grade 33 or higher or similar industry experience including district managers or five years as a successful agent." *Id.* at Ex. 2A. The job posting states it requires a "four-year college degree." *Id.* The job posting also indicates the following special skills are required: leadership skills, PC skills, "strong written and verbal communications skills", and "demonstrated analytical and organizational skills." *Id.*

Fifteen applicants were selected to interview for the five PLGC positions, including both Plaintiffs. *Id.* at Ex. 2 ("Boudreaux Decl."), ¶ 6.[4] Three people conducted the interviews: Leigh Boudreax, Sharon Reed, and Daniel Krueger. Boudreaux Decl. at ¶ 8. After each interview, the panel gave each applicant a score between one and five for each of the relevant competencies—Leadership, Communication, Technical Job Knowledge, Problem Solving, Decision Making, and Initiative—based on the applicant's answers to interview questions. *Id.* Ultimately, Reed (the hiring manager) made the decision about whom to select. *Id.* She also determined Leadership, Communication, and Initiative were the most important competencies to consider in filling the position. *Id.* Reed claims the PLGC position is unique in that it "requires a company employee, working in a field setting away from an office, to influence and inspire agents who are independent contractors." Def.'s Mot. Summ. J. at Ex. 3 ("Reed Decl.").[5]

Boudreaux claims job postings at Farmers are meant to be a "general hiring guide," and the "hiring manager has the authority and discretion to select individuals who do not meet stated qualifications or requirements listed in the job posting." Boudreaux Decl. at ¶ 5. She also states, with respect to the PLGC position, that the selection process "involved a subjective assessment of the applicants." *Id.* at ¶ 7. Ultimately, prior performance (for internal applicants), and a skill competency matrix based on the results of the panel interview were used to determine whom to hire. *Id.*

---

[4]Leigh Boudreaux is a Human Resources Specialist at Farmers who, because of her position, has knowledge of the personnel decisions that are the subject of this lawsuit.

[5]Sharon Reed is a Field Operations Manager for Famers, who oversees those in the PLGC positions. She participated in the interview process for the PLGC positions and is the person who made the decision not to hire Carr or Holly for a PLGC position. Reed Decl. at ¶ 2.

Apparently, both Carr and Holly received lower matrix scores than the chosen applicants. Reed states the consensus of the interviewing panel was that "Carr's and Holly's tenure [at Farmers] did not add sufficient value to outweigh the exceptional quality experience and skills of the candidates that were chosen." Reed Decl. at ¶ 4. Apparently, Carr received lower scores because he "had some difficulty with his communication and giving examples of goals, projects, or programs that he developed and executed... The panel was looking for more and at a higher level in the areas of leadership, communication, and initiative he fell short of the other candidates." *Id.* at ¶ 8. The panel saw him as someone who would do what was asked of him, but not someone with exceptional initiative. *Id.*

Likewise, Holly received lower scores because "he had poor communication and in many cases, inadequate examples in the areas of leadership, communication, and initiative." *Id.* at ¶ 9. The panel did not see him as someone "who stretched himself to develop new marketing programs or initiatives, but as someone who reacted to instructions given to him to perform job duties." *Id.* Reed states his "answers were rambling and often negative in nature." *Id.*

The applicants who were ultimately hired were Jay Olson ("Olson"), Jessica Bryant ("Bryant"), Brian Hastings ("Hastings"), David Zeornes ("Zeornes"), and Johnny Norwood ("Norwood"). *Id.* at ¶ 10. Reed explains these applicants generally demonstrated excellent communication and leadership skills, and gave detailed examples of accomplishments in relevant areas, such as leadership. *Id.* at ¶¶ 10-15. Reed gives specific examples of information about each successful applicant which factored into her decision to select him or her; for instance, Olson had planned, directed, organized, and led a department staff of professional claims representatives with "great results," *id.* at ¶ 18; Bryant had helped develop marketing campaigns and planned for more

than 200 agents in the state to meet the state's goals, and was recommended by her manager, whom Reed knew well, *id.* at ¶ 19; Hastings had a great deal of experience developing and implementing new business growth, came highly recommended by Farmers' top district manager, and was credited with playing an instrumental role in making his district the top district in 2005, *id.* at ¶ 20; Zeornes had responsibility for training and managing more than 20 employees and was responsible for top and bottom line results for those offices, had received an award in the previous year for top performance, and came highly recommended by a former co-worker of Reed's, *id.* at ¶ 21; and Norwood had been in a position very similar to the PLGC position for the past three years, and had solid experience in relevant areas. *Id.* at ¶ 22.

Reed acknowledges Hastings did not have a four-year degree at the time of the interview, but states "he was in the final year of a four-year degree program and had a 4.0 GPA." *Id.* at ¶ 20. Farmers conditioned Hastings' selection for the PLGC position on his obtaining the degree, which he did. *See* Boudreaux Decl. Reed also acknowledges Zeornes had not worked full-time for five years prior to the interview, but claims "he had part-time positions in addition to three-years of full-time experience, and was an otherwise exceptional candidate." *Id.* at ¶ 21.

The panel members were allowed to take notes during the interviews, which are attached to Defendants' motion for summary judgment. Def.'s Mot. Summ. J. at Ex. 3A. The final interview scores for Carr, Holly, and the selected applicants were as follows:

|  | Carr | Holly | Hastings | Norwood | Bryant | Olson | Zeornes |
|---|---|---|---|---|---|---|---|
| Leadership | 2 | 2.5 | 4.5 | 4 | 4 | 4.5 | 4 |
| Communication | 2.5 | 2 | 4.5 | 3.5 | 4 | 4 | 4 |
| Tech. Knowledge | 2.5 | 3.5 | 5 | 4 | 4.5 | 4.5 | 3.5 |
| Problem Solving | 3 | 2 | 4 | 4 | 3 | 3.5 | 4 |

| Decision Making | 2.5 | 2 | 4 | 4 | 4 | 4.5 | 4 |
| Initiative | 2.5 | 2.5 | 4 | 4 | 4.5 | 4 | 4 |
| Total | 15 | 14.5 | 26 | 23.5 | 24 | 25 | 23.5 |

Reed states under oath that the interview scores were based on age-neutral factors, and age was not discussed or considered under the interview or selection process. Reed Decl. at at ¶ 16.

*(2) The Marketing Specialist Position*

As stated above, Carr also applied for and was interviewed for a Marketing Specialist position. The job posting for that position states it requires a "four-year college degree," and a minimum of two years "business experience, managerial or equivalent." Def.'s Mot. Summ. J. at 2B. No special skills were specifically required. *Id.*

The interviews for the Marketing Specialist position were conducted by Daniel Krueger, who made the ultimate decision whom to select. *See id.* at Ex. 4 ("Krueger Decl."). Krueger states the selection process for the position "involved a subjective assessment of the applicants." Krueger Decl. at ¶ 4. He assessed internal applicants based on their prior performance and their interview performance, and external applicants based on their resumes and their interview performance. *Id.* at ¶ 5. After each interview, Krueger gave each applicant a score of one through five for each of the five relevant competencies—Leadership, Initiative and Drive, Time Management, Teamwork, and Communication. Carr was ultimately not selected for the Marketing Specialist position; instead, a candidate named R. Hilton was.

Krueger stated Hilton "did an outstanding job during the interview and exuded confidence." *Id.* at ¶ 7. Relevant to Krueger was that Hilton's communication skills were excellent, he had been a Farmers agent for the previous six years and had managed to build a very successful business in

the high-risk auto market, and Krueger felt he had "demonstrated excellent leadership qualities," had knowledge in the agency world, and had a strong work ethic. *Id.* At the time he was selected, Hilton was in the process of obtaining a college degree and was expected to obtain the degree within 18 months. *Id.*

On the other hand, Krueger states Carr provided examples of past leadership and initiative in his interview that were "okay," but which Krueger considered sub-standard when compared to Hilton's more relevant and detailed examples. *Id.* at ¶ 8. He felt Carr lacked the enthusiasm and confidence he was looking for, and this was reflected in his lower scores. *Id.* Furthermore, Krueger had worked with Carr since 1997, and this "impacted [his] thought process when making the decision." *Id.* Based on his prior experience with Carr, he did not feel he had a tremendous amount of initiative, although he kept an open mind during the interview. *Id.*

Carr's and Hilton's comparative scores after their interview with Krueger were as follows:

|  | Carr | Hilton |
|---|---|---|
| Leadership | 2.5 | 4 |
| Initiative and Drive | 2.5 | 4.5 |
| Time Management | 4.0 | 4.0 |
| Teamwork | 4.0 | 4.0 |
| Communication | 2.5 | 4.5 |
| **Totals** | **15.5** | **21** |

Krueger states under oath the scores and the decision of whom to select for the Marketing Specialist position were based on age neutral factors, and age was not discussed or considered during the interview or selection process. *Id.* at ¶ 9.

*(3)* *Discussion*

-11-

Based on the foregoing evidence—which includes the declarations under oath of all the panel members who interviewed Plaintiffs for the positions in question, as well as the scores Plaintiffs received in the various competencies compared with the successful applicants—the Court finds Farmers has articulated legitimate, non-discriminatory reasons for its decisions not to select Carr and Holly for a PLGC position, and not to select Carr for the Marketing Specialist position. In the opinion of Reed, the hiring manager for the PLGC position, Plaintiffs did not interview as well as the chosen applicants (as evidenced by the interview scores), and she felt the chosen applicants were better suited for the position. *See* Reed Decl. Likewise, in the opinion of Krueger, the hiring manager for the Marketing Specialist position, Carr did not interview as well as Hilton (as evidenced by the interview scores), and Hilton was better suited overall for the position. *See* Krueger Decl.

"An employer's subjective reason for not selecting a candidate, such as a subjective assessment of the candidate's performance in an interview, may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 616 (5th Cir. 2007). But because subjective reasons can be a pretext for discrimination, such "reason[s] will satisfy the employer's burden of production ...only if the employer articulates a clear and reasonably specific basis for its subjective assessment." *Id.*

In the present case, the interview scores and the declarations of the interviewers reference clear and reasonably specific bases for their subjective assessments. For instance, the interviewers explained in their declarations why they gave Plaintiffs lower scores than the successful applicants for some of the competencies (which is discussed at length *supra*). Furthermore, Farmers has introduced into the record the interview notes for all the relevant candidates, which contain the scores and comments by each interviewer for each candidate. *See* Def.'s Mot. Summ. J. at Ex. 3A.

Thus, Farmers has articulated clear bases for its subjective assessments, which are supported by contemporary notes.

### C. Pretext or Motivating Factor

Because Farmers has articulated a legitimate, non-discriminatory reason for not hiring Plaintiffs, their prima facie case is dissolved and the burden shifts back to them to establish either: (1) Farmers' proffered reasons are not true but are instead a pretext for discrimination; or (2) Farmers' reasons, while true, are not the only reason for its conduct, and another "motivating factor" was Plaintiffs' age. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). "The mere fact that an employer uses subjective criteria is not ... sufficient evidence of pretext." *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 882 (5th Cir. 2003). To carry their burden of showing pretext, Plaintiffs "must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001).

Plaintiffs have attempted to establish Farmers' asserted justifications are mere pretext in several ways. First, Plaintiffs submit the EEOC investigation file for both of their claims. *See* Pl.'s Resp. at Exs. A, B. In both cases, the EEOC determined there was reason to believe violations of the ADEA had occurred with respect to the hiring decisions in question.[6] "EEOC determination letters can be probative of discriminatory intent," *Bugos v. Ricoh Corp.*, 2008 WL 3876548 at *4

---

[6]Specifically, in Holly's case, the EEOC determination indicated Farmers' reasons for not hiring Holly for the PLGC position (i.e., "that [Holly] was not as qualified as the persons selected") were suspect; the EEOC found "[e]vidence obtained indicates that [Holly] was more qualified for the position than at least one person selected who is considerably younger than [Holly] and did not possess the minimum requirements for the position at the time of his selection." *Id.* at Ex. A, pp. 047. In Carr's case, the EEOC determination states "Although [Farmers] strives to claim that [Carr] was not as qualified as the selectees for the positions..., the evidence indicates that for each position there were selectees who did not even meet the requisite minimum qualifications of the job whereas [Carr] did." *Id.* at Ex. B, pp. 204.

(5th Cir. 2008), although they are not conclusive evidence, nor or they binding on the Court. *See Septimus v. Univ. of Houston*, 399 F.3d 601, 610 (5th Cir. 2005) (holding summary judgment was appropriate when plaintiff failed to set forth sufficient evidence of pretext, despite EEOC's finding of reasonable cause); *Wright v. Columbia Women & Children's Hosp.*, 34 Fed. App'x. 151 (5th Cir. 2002) (affirming summary judgment against employee despite an EEOC determination letter finding reasonable cause to believe the employer had unlawfully discriminated, because the EEOC letter was conclusory and not supported by the summary judgment evidence).

Plaintiffs also set forth evidence Farmers has given false and conflicting reasons for not selecting Plaintiffs. For instance, Carr claims the Farmers Workplace Relations and Diversity office purported to investigate his initial claims of discrimination, and issued him a report stating in part that one factor in his non-selection (out of two) was the fact he was not willing to relocate. *See* Pl.'s Resp. at Ex. E ("Carr Decl.") at ¶ 3 & Ex. A. Carr claims this was a false reason for not offering him the position, as he made clear in the interview he was willing to relocate. Carr Decl. at ¶ 4. Indeed, the notes taken by the interviewers during the interview indicate Carr was willing to relocate.

Furthermore, the Farmers Workplace Relations and Diversity office's report also states the primary factor was that the successful candidates had been "rated higher on performance." *Id.* at Ex. B. However, Farmers does not presently claim past performance as a reason for its non-selection of Carr, and it does not identify any instance of any of the successful candidates being rated higher in their previous performance. In fact, Plaintiffs note Reed testified initially in her deposition that she did not remember ever seeing Carr's performance reviews, and then later testified she would have "briefly reviewed" them, but would not have placed "too much weight" on them because they were for a different job. *See* Pl.'s Resp. at Ex. E ("Reed Depo."), pp. 34; 93-94. Plaintiffs claim the

internal investigation report therefore directly contradicts the reasons Farmers now proffers for their non-selection.

Plaintiffs also note some of the significantly younger applicants who were selected for the positions failed to meet the minimum qualifications. For instance, four of the five successful candidates for the PLGC position—all of whom were significantly younger than Plaintiffs—failed to meet the posted minimum qualifications. As stated above, Farmers' own posting for the job indicated a four-year college degree was required. Both Plaintiffs had earned four-year college degrees at the time they interviewed. *See* Holly Decl. at ¶ 3; Carr Decl. at ¶ 6. However, it is undisputed Hastings (age 37) had not yet completed a college degree when we was hired for the PLGC position. *See* Reed Depo. at 111. Another minimum requirement, as stated above, was "Five years with [Farmers] in Marketing, state office, or Underwriting in a salary grade 33 or higher or similar industry experience including district managers or five years as a successful agent." It is undisputed both Plaintiffs met this requirement. However, Zeornes (age 26) was selected for the PLGC position despite the fact he was just three years out of college and did not meet the foregoing requirement. *See* Reed Depo. at 113-114. Likewise, neither Bryant (age 30) nor Olson (age 38) met the minium experience requirement. *Id.* at 116-117; Pl.'s Resp. at Ex. B (EEOC investigation file).

Plaintiffs also note the five successful candidates for the PLGC position were 30, 37, 40, 38, 25, and 35 on the day they applied for the position. Pl.'s Resp. at Ex. B. In contrast, five of the twelve unsuccessful applicants (whose ages are known by Farmers) were over the age of 50 on the day they applied for the position, including Carr and Holly. The average age of the successful applicants was 34; Holly and Carr were 53 and 54, respectively. *Id.* Plaintiffs claim they were far better qualified than these younger applicants, having worked for Farmers for far more years. They

even claim Holly was "deemed so knowledgeable of the duties of the PLGC position that Farmers sent him to California and assigned him to the team drafting the training program fro the new PLGC position." *See* Pl.'s Resp. at 10 (citing Holly Decl. at ¶ 5).

Based on all of the foregoing, the Court finds Plaintiffs have created a fact issue as to whether age was a factor that motivated Farmers' non-selection of Holly and Carr for the PLGC or Marketing Specialist positions. Although the Court does not here make any comment on the persuasiveness of the evidence offered by Plaintiffs, it does find a trier of fact might reasonably infer, based on that evidence, that Farmers is dissembling to cover up a discriminatory purpose.

## Conclusion

Therefore, in accordance with the foregoing:

IT IS ORDERED that Defendant Farmers Services, LLC's Motion for Summary Judgment [#21] is DENIED.

SIGNED this the 17th day of March 2010.

SAM SPARKS
UNITED STATES DISTRICT JUDGE